Case number 23-1288, Stingray Pipeline Company, LL.C. petitioner v. Federal Energy Regulatory Commission. Ms. Proctor for the petitioner, Ms. Gell for the respondent. Good morning, Council. Proctor, please proceed when you're ready. May it please the Court, I am Shemin Proctor, representing petitioner Stingray Pipeline Company, LL.C. I'd like to reserve two minutes for rebuttal. Stingray Pipeline System has faced steadily declining volumes to the point where it has very little throughput, almost slightly more than 1%. Its costs significantly exceed its revenues. Operation and maintenance costs $3.5 million, revenues of only $72,000. In light of those circumstances, Stingray petitioned the Commission for requested abandonment by sale of its WESCAM-509 system to Triton to use for abandonment. Rather than grant the abandonment request, the Commission imposed an onerous condition that Stingray either repair Segment 3394 or obtain the consent of the shipper that uses that segment. Stingray requests that the Court vacate and reverse the condition for three reasons. First, the record is not adequate to support the Commission's decision. Second, the Commission's reasoning, whether using the abandonment analysis or simply trying to apply the facts and find a reasoned path to its decision, it's not possible. And third, the Commission's conditioning authority has been exceeded. Doctor, so Stingray has the burden of demonstrating that abandonment is in the have provided any evidence about Segment 3394 until rehearing? Evidence about the segment before? Right. So, I mean, so FERC imposes the condition in its initial order and it reaffirms that in rehearing, but it's only at the rehearing stage that Stingray suggests that, you know, rebuilding Segment 3394 is going to be very costly. And then, you know, there doesn't seem to be evidence about ERT's need for that segment or, you know, how to balance those things. I mean, and isn't that Stingray's burden before the Commission? Yes, Your Honor. Stingray does have the burden and Stingray has shown that the demand on its system, including that very bit, small bit of demand that is ERT. ERT's demand is only less than one-fifth of the firm demand on the system, which is only 7,000 decatherms per day on a system that's 350,000 of capacity, which Stingray submits shows that there is no demand, which means it's not in the public convenience and necessity. That's the purpose of explaining how little demand there is on the system. When in Great Lakes, this Court recognized that when applicants like the pipeline Stingray attempt to obtain certificates of public convenience and necessity, they're required to show 80 or more percent of demand in order to even have a pipeline certificate. Here, the exact opposite is true. There is almost zero demand. One percent of the throughput is on the system now. And so Stingray showing that it has so little demand is system-wide. And then also, with respect to Segment 3394, which you specifically asked about, there is literally only one shipper, one firm shipper on that 25-mile segment of pipeline. So by showing the absence of throughput on the system and showing how there's only 7,000 decatherms of firm commitments on a of 350,000, that shows that the system is not required for the public convenience and necessity. Demand is the criteria for showing. What about continuity of service? Right. Continuity of service, too, has to be viewed in the context of demand. And the Commission's own findings, where you look at demand and you look at the costs, so Stingray's costs are staggeringly higher than its revenues. And the Commission's own finding in the abandonment order, relying on Connecticut, states we will not require a pipeline where the costs exceed its revenues to continue and to operate and maintain a system. And yet, then the Commission imposed the condition that requires exactly that, a repair. So repair is part of maintenance. So if, because the costs so exceed the revenues, the Commission is not going to require a pipeline to undertake or continue to take, undertake maintenance and operate at the system. It is completely unreasonable to require the pipeline to make the repair. At one point, Stingray indicated that it was going to bring back up this piece, the 3390, the 3394 piece. And if it's so obvious that it's, it doesn't make any sense at all to reconnect it because nothing's going through it, and it would cost an exorbitant amount to do it, why was there ever even a thought bringing it back up? Well, there's two, there's a distinction there, Your Honor, between segment 3394 and the entire system. So what, and what Stingray actually said is that it was developing a plan to bring segment 3394 into service. So life in the energy company is not static. There are a lot of different variables, including, frankly, what that producer is willing to do. And we did brief the issue of if, in fact, that shipper was willing to pay some of those costs, in fact, bear a significant amount of the burden because the shipper is, frankly, the only beneficiary of that, then there would still be the logistics to actually undertake a repair. So there are a lot of different factors that go into that. So what Stingray actually said was that it was looking at options to develop a plan to place it back in service. It was not until the commission's order requiring, mandating that repair that Stingray, frankly, realized that the commission, first of all, Stingray actually thought that the commission simply had misunderstood abandonment in place versus the abandonment by sale. But out of an abundance of caution, it included those repair costs because Stingray had, frankly, wrongly assumed that the commission would know if it's requiring a repair, that's going to cost money. And it had already found that it wasn't going to require the pipeline to construct, I mean, to operate and maintain its system. So by requiring a repair, you're doing exactly the opposite of what the commission has consistently said it will not require pipelines to do. So that's the reason the repair estimate comes up is only after it's mandated that Stingray had to put it, put the segment back into service or obtain the consent. Ms. Proctor, I had a question about the remedy that Stingray is seeking because Stingray has asked this court to vacate just the condition and I'm wondering if you have any precedent for this court taking such an action. I mean, here it seems that FERC made a determination that abandonment is in the public convenience with the condition. So what authority would this court have simply to vacate the condition? We have to vacate the entire order and then remand to FERC. We actually, Your Honor, asked to reverse and vacate. So our view is that you can reverse the portion of the order that addresses specifically the condition rather than only the. But how do we, how do we do that? I mean, has FERC made a finding that it would be in the public convenience without the condition? I mean, that. Yes. Yes, Your Honor. It has. Where do you read that? It's in the order. It's in the paragraph, the last paragraph before the section that begins addressing the damaged facilities. I didn't bring the number, but in fact, the commission took issue with Stingray's statement that the commission had in fact found that the abandonment was in the public convenience and necessity without the condition that it imposed. So there is a statement in the order, in the abandonment order, Your Honor. Okay. Maybe when you come back up. Yes. When I come back up for rebuttal, I will point out that paragraph. Okay. Thank you, counsel. We'll give you a little time for rebuttal. Okay. From the commission now.  please the court. Stingray misrepresents what these orders actually require. To be clear, the commission did not deny abandonment. It authorized abandonment. Just because Stingray doesn't like one of the conditions, it doesn't transform the commission's authorization into a denial. Stingray also misrepresents what the condition actually requires. It doesn't force Stingray to make any repairs, despite repeatedly promising to do so. Instead, this condition simply respects Stingray's contractual obligations to firm shippers by allowing Stingray to negotiate with ERT and obtain its consent not to repair. At bottom, these orders, they neither force Stingray to continue operating its pipeline, nor do they require Stingray to make any repairs. Stingray claims that FERC made a finding in its abandonment order that abandonment would be in the public interest without the condition. That's not true. The commission addressed in the abandonment order separately the facilities that were damaged by the hurricane. So in the first part, it discussed generally what was included in Stingray's amended abandonment application and the economic factors that Stingray had cited of declining throughput and revenues. Then it proceeded to consider the segments that were damaged by the hurricane. And it noted the shippers' protest that segment 3394 had been taken out of service. And at the end of that discussion, the commission concluded that to render abandonment in the public interest, it would impose a condition that Stingray either repair the segment as it had repeatedly promised to do, or negotiate a settlement with ERT not to make this repair. Where's FERC's reasoning on why this condition is in the public interest? I mean, there's overwhelming evidence that this pipeline is not needed by anyone. It has a tiny fraction of its capacity being used at this point, as the commission recognizes. And then, but the commission imposes this condition. You know, where's the reasoning behind that? Well, to start- Especially in the rehearing order, where once FERC knows how costly it's going to be to repair this segment, I don't see the analysis of how that cost is weighed against all the other evidence of it being in the public interest to abandon this pipeline. To back up a little bit. Under the Natural Gas Act, the commission must ensure that any abandonment grants is permitted by the public convenience necessity. And as both this court and commission have recognized, a primary consideration under that analysis is whether the requested abandonment would deprive captive customers of service. So although it's true that economic factors like declining revenue and throughput would weigh in favor of abandonment, that also has to be balanced against- This line of cases about captive consumers and continuity of service began with a case in the 60s about continuity of service to the public, i.e. end consumers, not a single producer of natural gas. So where's the analysis about the public interest? I mean, is there any claim that by not restoring the segment, there will be members of the public who are not able to get natural gas? It doesn't seem that that is the case, given the structure of the pipeline and gathering facilities. Well, under commission precedent, abandonment that would deprive a firm shipper of service has sufficed for the commission to find that it needs to condition abandonment to render it in the public interest or necessity. Is there any DC Circuit cases reaffirming that, where the only interest is the private interest of a gas producer, unconnected to end consumers of natural gas? Well, I'm not aware of a- That's a big difference for the public interest. I understand. While not aware of a specific case with that specific factual pattern, in, for example, Michigan Insolidated, the DC Circuit did reaffirm that it's the harm to captive customers along a pipeline that is a prime consideration in this public interest analysis. And shippers like ERT, they're under a life of lease contract. So in exchange for firm service, they have agreed to dedicate their gas reserves to Stingray's pipeline for the entire life of those reserves. So can I ask a question about that? Sure. As Judge Rao mentioned in the other argument, the burden is on the party seeking abandonment to justify why a condition like this may not be in the public interest. So that may be part of the equation here, is that even if conceptually it were possible that you could have a situation in which attaching a condition like this makes no sense because there's no ultimate consumer who's going to benefit from it. There's all kinds of reasons why this particular condition conceptually might not make sense. The commission isn't taking the view that any time there's somebody who has a firm, what's it called, a firm? Firm shipper. Firm shipper, where any time that you have a firm shipper, then there's always a public interest in having a condition like this, no matter what the demand might be, no matter how often that strip of the pipeline may be being used. I don't understand the commission to be taking that position. That's correct, Your Honor. The order doesn't purport to be saying that, but you also don't dispute that there could be situations in which attaching a condition like this might not make any sense because it turns out this piece of the pipeline actually isn't going to be put to any productive use from here on out. There's no end consumers that are actually going to be affected by it in any way, shape, or form. So even if it's true that there's a firm shipper who has a guarantee to use it, if it's not actually being used and there's no productive capacity there whatsoever, it might not make any sense under the public interest to impose this kind of condition in some situations. That's correct, Your Honor. The commission is not taking a hardline stance that so long as there's one firm shipper that would be deprived of service by unconditional abandonment that it can't grant that abandonment. There very well may be situations in which the commission would grant unconditional abandonment for a single shipper, but that's just not the situation here. How would that come about practically? So if you had that kind of situation, and maybe this is, maybe this case is that kind of situation, but if you had that kind of situation, would the party seeking abandonment then in their request for relief to the commission then come forward with evidence that shows why the circumstances meet that kind of scenario? Correct, Your Honor. The burden would be on the party seeking abandonment to prove that the interests of this firm shipper are far outweighed by the interest in unconditional abandonment. And I would caution that those circumstances, I can't really speculate as to what that might look like. It just simply wasn't the facts before the commission. And the commission would have to really think carefully about that situation because it would need to find a reasonable way to distinguish its decades of precedent holding the other way. Ms. Gout, the commission here provides no reason why it's in the public interest for the condition to repair segment 3394, other than the fact that there is a firm shipper who will no longer have access to buy. And that's the only reason that is given. So you might say that the commission is not taking a hard line stance against that, but that's the only reason provided here. Continuity of service to a single natural gas producer ERT. That's the sole reason for the commission. There's no consideration about whether they're really using the pipeline, how much throughput there is, how that's balanced against the overwhelming showing about why there's a need for abandonment. Well, I would respectfully disagree with that, Your Honor. The commission did note in its abandonment order that these are life of lease contracts that require. But there's no discussion about what sort of use is actually being made of segment 3394 or would be made if it were to be repaired. Well, the thing is, in ERT's protest to the commission, it explained that its gas had been shut in by the outage of segment 3394. That, and in combination with the data responses that the commission requested from Stingray about its plans for abandonment, demonstrate that up until the outage of this segment, ERT had been shipping volumes consistently for 13 years under its contracts on Stingray's pipeline. And it wasn't until this segment was damaged and not repaired that its gas was then shut in, and it wasn't able to continue producing gas and serving its customers. And I'll note that- Doesn't FERC have to think about what the effects are of shutting in ERT versus all the interests on the other side? It did. So it seems that FERC is basically saying that shutting in one producer's supply is sufficient to impose this condition. Because there's no analysis or weighing of the costs and benefits of doing that. It's not saying that shutting in one shipper's supply is necessarily sufficient. And in fact, it granted abandonment because of the declining throughput and revenues on the pipeline. However, the condition, it merely respects that Stingray has active firm contracts for service with ERT. And to let it abandon- And that's the only reason, the active firm contracts. So that's sufficient. Active firm contracts of any amount, irrespective of how much gas is actually being shipped, is sufficient to impose a condition like this. It's not necessarily true, irrespective of any amount. And I don't want to sort of- But FERC makes no analysis of the amount or weighing any of it. I mean, in the rehearing order, it says we did weigh these things. But in the initial order, they never weighed any of those things. So- It does note that ERT is or had been, up until the outage of the segment, continuing to ship gas. So at the time of the initial order, was there any reason to suppose that there was any problem? Because Stingray said that, quote, "'Stingray will communicate its plan "'to bring Segment 3394 back into service "'in the normal course.'" So at the time of the initial order, without some indication from Stingray that there was a problem, would there have been any reason for the commission to doubt that it made sense to bring 3394 back online? That's correct, Your Honor. Stingray had repeatedly represented to the commission throughout this proceeding that it had legitimate intentions of repairing Segment 3394. Until the rehearing. Until the rehearing. At that point, though, then Stingray does say it's gonna cost a significant amount. Right. I don't know that they introduced evidence. Maybe the commission considers that evidence, a statement. I don't know the answer to that. That's correct. It wasn't until the rehearing request that Stingray told the commission for the first time, "'Actually, we don't plan to do anything "'about this damaged segment. "'We're just going to let Triton, "'a non-jurisdictional entity, decide what to do with it.'" So when the commission was actually considering Stingray's abandonment application, they had done so under the mindset that Stingray would figure out how to resolve the situation with 3394 and ERT, whether that was by repairing the segment, like they had repeatedly said that they had plans to do, or by arriving at some sort of settlement with its shipwreck. That was the commission's underlying understanding of what would happen with this abandonment application. Can I ask this question that I think dovetails with Judge Rau's line of questions? So suppose you have a situation in which at the initial stage, you don't have an affirmative representation by the party seeking abandonment that they intend to bring back online the segment that's in question. There's no indication one way or the other, but it's undisputed that there is a segment that is not online, and that there's a firm shipper who would benefit from that segment being online. If there's just no indication whatsoever about the productive use of that segment, what would happen? How would the commission look at that? So I don't want to speculate as to what the commission would do under circumstances that weren't before the agency. And I would just caution that I'm guessing here that it's possible that the commission would take a different route if Stingray had never made these representations or if it had been upfront in its initial abandonment application that it didn't have real intentions of repairing the segment or that it was too costly. But the issue is that the commission had analyzed this abandonment application under one understanding of abandonment that Stingray was going to resolve the situation with 3394 and ERT. And at the rehearing stage, that's just much too late for Stingray to then say, actually, nevermind, we're not going to do anything. That's a different abandonment proposal. And if Stingray had brought that up earlier, it would have allowed, for example, other shippers or other parties to provide comments and submit evidence to challenge some of these assertions. You said that's a different abandonment proposal. That's an interesting point. I mean, could Stingray tomorrow, so after this proceeding ends, let's just, I don't want to, I'm not saying that we're going to go this way, but let's just to carry out the question, let's suppose that the commission prevails at this stage. Then after this case ends, could Stingray the next day file an abandonment petition asking for abandonment without the condition? Yes, it could refile, withdraw its current abandonment application and file a new one that this time upfront includes all of the relevant information, includes the cost information, explains that it believes that these costs are too high, because then that would give the commission an opportunity for a new hearing. There's no claim, or issue to CATA in the commission context or something that would say, oh, wait, you already tried this and you didn't do your job the first time. And so we're just not even going to look at the second. As far as I'm aware, that wouldn't be an issue. Isn't the, I mean, it seems that you're, the fundamental position that you're taking on behalf of the commission is that the commission didn't have the burden to justify the condition. Stingray had the burden to demonstrate that it was entitled to unconditional abandon and they didn't meet that burden. Is that your fundamental position? That's correct, your honor. Based on what evidence and arguments Stingray actually did provide before the commission below and not just on appeal here, the commission found that the condition continued to be in the public interest to require Stingray either make ERT whole for its contractual obligations or otherwise put in that repair that it had repeatedly represented to the commission that it would make. Ms. Scow, I mean, to Judge Wilkins' question, that wasn't the reason given by FERC in its rehearing order. Sorry. That Stingray failed to meet its burden. I believe it actually was, give me one second. So in the rehearing order, the commission discusses the fact that it is Stingray's burden. I believe in paragraph 13, perhaps, it's ultimately Stingray's burden to demonstrate that the abandonment application is in the public convenience or necessity. And it notes that some of the arguments that Stingray's make improperly seeks to shift that burden from Stingray to the producers coalition. So that- But it's not a conclusion by the commission that they failed to meet their burden. The commission simply says that this abandonment with the condition is in the public convenience and necessity, that's an affirmative finding. It's not a determination of a failure to meet the burden of proof, which are two different conclusions. I understand, but the commission's reasoning, the logical understanding of that is that Stingray had not met its burden to demonstrate that abandonment was unconditionally in the public interest or convenience. And that's also why it says in paragraph 13 that Stingray had improperly sought to shift that burden onto producers coalition because it itself had not met that burden. I mean, I guess maybe some of this turns on the chief judge's question, which is could Stingray tomorrow file a new abandonment application? It could, it could. And I just wanna emphasize again that if this had been properly presented at the outset, we would have had a fulsome hearing in which Stingray could present its cost estimates, have a detailed breakdown, and it would give the shippers and other parties an opportunity to challenge those estimates and those costs in Stingray's arguments. But by sort of trying to sweep this all in at the rehearing stage, it deprives the commission and the other parties of an opportunity to fully develop that record. And the commission can't just switch to this different abandonment proposal at this late stage. So Jessica, let me, in the, I mean, I'm just not sure how FERC proceedings, you know, I guess work practically, but at the initial order stage, would Stingray have been aware that FERC was considering this condition or would the first time that they learned of the condition be when the order issued? Well, respectfully, Stingray had from the very first time, segment 3394 was brought to the commission's attention, already represented that it would develop a plan to return this segment to service. So it was from the outset aware of the fact that the commission was considering the repair of the segment. And in fact, in a data request that the commission made three months before its abandonment order, it specifically asked Stingray, hey, what is the status on the repairs to segment 3394? And Stingray responded to the commission, we're still in the process of developing a plan. It gave no indication whatsoever that the cost of repair might be too high or that it actually no longer intended to place this segment back into service before abandonment. So the upshot that Stingray would have had a reason to know that the commission was focused on section 3394, but they wouldn't have necessarily had a reason to know that the commission was considering imposing a condition, or is it? I believe that they would have reason to know that the commission was considering imposing a condition. First, like I mentioned, it had been an issue throughout multiple rounds of protests from the shippers or data requests specifically from the commission on the status of the repair. I'll also note that generally in these proceedings, typically pipelines will negotiate with their shippers ahead of time in advance of abandonment to either arrange alternative service or negotiate with them to terminate their contracts if they're not intending to repair or find an alternative service route for that shipper. And Stingray itself with respect to its mainline application in the sole shipper that had its gas shut in in that application already voluntarily agreed to negotiate some sort of agreement. And also in its West Cameron application had proposed constructing an interconnect to another pipeline before abandonment. So these are all things that Stingray was aware that the commission would look for it to do to either construct new facilities to provide alternative service or reach some sort of alternative with its shippers to negotiate them to the terminate their contracts. I just have one other question which is, so here the abandonment is not in place, it's abandonment by sale to Triton. So why couldn't Stingray assume that ERT and Triton could work this out, right? Like if there was a commercial need for the pipeline to be repaired, then they could work that out. I mean, I understand that after abandonment it would not be a FERC jurisdictional pipeline any longer, but why wouldn't that be a fair assumption? That because it's abandonment and sale, the buyer of that Triton could negotiate with ERT. For precisely the reason you mentioned after abandonment, the commission has no regulatory authority over what Triton does with that damaged segment. It could very well say, we don't plan to do anything with it. We never intend to repair it and it just would be outside of the commission's- But not everything in the universe has to be within FERC's jurisdiction. I mean, we have a private marketplace and if there's a need for a pipeline, if there's an economically beneficial reason to repair the pipeline, it would occur. I understand, but as to the, for example, the C-ROB and Triton interconnect, that's also something that Stingray negotiated with Triton and it was a condition of abandonment that that interconnect be built before abandonment. So here, it's simply that if Stingray wanted to, it could negotiate with Triton to repair this segment before abandonment and that would still satisfy the commission's condition. If that's how Stingray wants to achieve the repair, it can work with Triton to make that repair possible. The commission would just ask that it be done before abandonment. Under the proposed, under the terms of the proposed sale to Triton, did Triton assume the obligations of Stingray with respect to that firm ship? In other words, Stingray had an obligation that presumably it was out of compliance with and it was out of compliance with its certificate with its inability to transport the gas of that firm shipper. So when it's sold to Triton, does Triton have the same obligation, even if they're not bound by a certificate anymore and they're outside of FERC's jurisdiction? To the best of my knowledge, I don't believe that it transfers to Triton. I believe Triton may need to execute new contracts with shippers and there is some discussion about that in, I believe, either the abandonment order or one of Stingray's abandonment applications about Triton executing new contracts with the shippers after abandonment. So I guess if they had assumed Stingray's obligations, you could say, well, they have to work something out because they've assumed the obligation, but you're saying that if they kind of start with this clean slate, they may or may not have much incentive to work something out. That's correct, Your Honor. After abandonment, I'm not sure what incentive Triton would have to remedy, essentially, what is Stingray's breach. Sure, Michael, okay. Thank you, Ms. Gough. Thank you. Ms. Proctor, we'll give you the two minutes that you asked for. Thank you, Your Honor. There was a lot there, so I'm gonna try to be very quick. The first point I believe you, Judge Rao, mentioned was, and also you, Your Honor, with respect to the rehearing request, a rehearing request is meant to be, it is meant to serve the purpose of having FERC reconsider the issues. And so there is no bar to new information being provided during the rehearing. I would also note that the shipper ERT was part of the producer coalition. They filed at least three pleadings in this proceeding while it was at FERC and never mentioned any demonstration of harm. FERC itself found that, so they easily could have mentioned if they have reserves, if they wanted to flow. That did not happen. With respect to the single shipper questions that Your Honors began with, that is exactly the abandonment analysis, that the issue is whether the abandonment is in the overall public interest and that abandonments are not prohibited by any harm to a narrow interest. So even if there were harm to ERT and Stingray does not concede that, that harm would be to a narrow interest because this case is unlike any other case FERC has seen with overwhelming evidence in favor of abandonment. In terms of ERT. Ms. Proctor, does Stingray have evidence about the value of rebuilding the pipeline to ERT compared to the cost of bringing that segment back online? Excuse me, the value to ERT? Right. You know, so Stingray says it's gonna cost seven to $9 million to repair segment 3394. Does Stingray have any idea of how much that, you know, having access to that pipeline is worth to ERT? Like what is the economic value of shutting in ERT? Your Honor, there's no information on the record, but certainly if the segment were of a value above seven to $9 million, I would assume that ERT would be willing to, or even close to that, ERT would be willing to offer to pay for some of those repair costs. But there's no evidence one way or the other? No, there's no evidence in the record of that. As to the question whether Stingray should have known that a condition was going to be attached to the certificate, the answer there is absolutely not. Stingray believes that it has carried the burden and that the factual findings, as well as the commission's own findings, are overwhelmingly in favor of abandonment. So when that condition was put on the order, that was when Stingray realized, you know, the commission doesn't understand that when it's saying it's developing a plan and it does not have an anticipated service date, that is showing difficulty. That is not showing an intention to put it in service on a specific date. And then I believe Your Honor's asked about whether if Stingray could file tomorrow another abandonment application. Stingray's application was filed September of 2020 and it received its order in June of 2023. So it took 33 months. I realize I'm out of time, but that effort would render this entire effort a nullity based on a misunderstanding and misinterpretation of Stingray's representations to the commission. So I respectfully ask that you would vacate and reverse the condition. Thank you, counsel. Oh, I'm sorry. I apologize. Your Honor's had asked about the site and I did want to give that, if I may.  It is JA 282, which is paragraph 48, and reads, based on the above, we find that the abandonment by sale to Triton of the West Cameron 509 system is permitted by the public convenience or necessity. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Wilkins; Rao